Our next case today, number 241834, United States v. Requis Joel Nieves-Diaz. Will counsel for appellant please come up and introduce yourself on the record to begin. Good morning, your honors. May it please the court, AFPD, Sergio Perez, arguing on behalf of Mr. Nieves. I would like to reserve two minutes for rebuttal. This is a machine gun possession case involving no actual gun. Mr. Nieves possessed only a firearm chip accessory, loose bullets, and drugs. Still, the district court sentenced to 25 months above the top of the guideline sentencing range, a 60% upward variance. In doing so, the court ignored defense counsel's primary argument concerning the lack of gun and lack of danger, and provided no plausible explanation for a significant upward variance. This sentence was procedurally and substantively unreasonable, and this court should vacate the judgment below and remand for resentencing. I'd like to address two main points that span both the procedural and substantive unreasonableness analysis. The first one, the lack of gun and lack of dangerousness finding, and the second, the unexplained increase in the upward variance between the original sentence and the resentencing. As I said, number one, no gun, no danger. This was counsel's theme below, and it really permeates both the sentencing memo and the sentencing hearing itself. The district court did not explicitly- Just to be clear, you're not arguing that the upper variance in and of itself is error, are you? We're arguing that on this record, it was error to not provide reasons for that. So yes, we are arguing that it is error itself. Error in and of itself, or error in the reasoning? In both. What was the error in the application? The error is that this court's cases tell us that the general mine run machine gun possession case is generally an actual gun, chipped lock, with magazine and with an additional, perhaps an additional magazine. That's sort of the ballpark we're looking at in terms of what the Heartland, what the mine run case is. What we have here is a chip, no gun, bullets that don't even match that chip. So even if there were a gun, there would not be any danger. So the court was troubled by the amount of the ammunition? Yes, and counsel explained to the court, Your Honor, when we look at these kinds of cases, what the First Circuit has told us, and this is Rivera-Santiago, what we do is an analysis of how does the amount of ammunition somehow increase the danger or the harm to society? Usually based on the fact that there is a physical weapon. And so if I have a physical weapon with three bullets versus 15 bullets, then I have an increased danger. Counsel said that at the beginning of the hearing. This is around AD 11. The district court gives then its sentence around AD 33. And then counsel reiterates that after the fact and says, Your Honor, the bullets matter where there is some sort of increased harm. And really the district court absolutely fails to engage with that rationale. And this is really the type of argument that really cuts against the coherence of the sentence. The government had a rather interesting argument on that point. The government says that having that amount of ammunition means that he had a gun somewhere. They just didn't find it. Or that he was in the business of selling. I mean, is that an unreasonable inference? It's pure speculation, Your Honor. And the argument was raised below. But you can reframe it as, okay, at the moment he didn't have the gun, but he has all the accoutrements. He's ready. He's dealing drugs. That seems clear. And the accoutrements are all there. And either they didn't find it or he doesn't have it then. But the judge could say, he's good and ready. And that makes him a danger. On this record, Your Honor, all we have is a straight plea where Mr. Nieves says that he was sort of at the minimum element here is that he was in dominion and control of the area. We know nothing about why this... Was he seen dealing drugs in that area? That's a fact. We know that he was dealing drugs in the area. We do not know anything about the bullets. And this court already told us in its first opinion two things. One, ammo by itself cannot cause harm. That's in this court's opinion. And the court also told us... That was for the purpose of the enhancement. It was, Your Honor. Whether it was being used in connection with trying to intimidate the other parties. But that's a separate logic from what the district court here relied on, which is how concerned should I be about the persons who committed this offense. And he says quite concerned given the amount of ammunition this person has, given the inferences I can say. So in your brief, are you contesting whether there's a basis for saying that the ammunition was his? No, we're... Okay, so then once we start from the premise it's his, why is it so speculative to infer that that's not like an ornament? It's likely to be used in some way or has been used or is reflective of being involved in the gun trade and as somebody who deals in drugs. Our cases are, you know, many, many cases from us and from the Supreme Court and everybody else saying that's not a good mix. So that makes this a bit of a different case than your mine run case. The mine run case isn't somebody who is drug dealing. And the mine run case also isn't somebody who's got that amount of ammunition. So two responses, Your Honor. In terms of why can't we infer anything from this, this is a straight plea. There are no facts on the record about those bullets other than at this court no... We're just on preponderance at this point. And then we're reviewing for clear error. And so isn't... Once he acknowledges that he is in control of that ammunition, you're not disputing that. He's in control of that area. We know nothing about his relation. Wait. He possesses the ammunition. Otherwise, we're not even here. He pled guilty to that, right? Yes. So he admits beyond a reasonable doubt those are his bullets. Yes. Constructive possession, whatever. Yes. Yes. We can frame it. Yes. Okay. So you have them. Why has he got them? We don't know. And the district court made no findings to that effect. And I've made no inference that... Do you have... I mean, it's like an odd thing to have a whole bunch of those, right? And so the inference, if we're asking, is it clearly erroneous to infer that the person, more likely than not, not beyond a reasonable doubt, has them for the purposes of using them in some way? And to add to that, he's previously convicted of a drug conspiracy that involved a gun. So the judge could consider this universe of factors, say, what am I dealing with right now? And that's all part of it. Right. Well, again, we think it's significant that this court said the first time around that there were no findings on this record. And there are no even, other than the inferences that Your Honors have laid out, are the circumstances... The idea there was, could you infer a very specific type of use of the bullets? Yes. Which would be to intimidate in the moment. And we concluded there was no basis for that. Right. You're now asking us to say you can't infer anything. For all we know, he's a collector. And it is possible he was. The question is, would it be clearly erroneous to think it is more likely than not that he wasn't? And on this record, I guess I'm struggling other than just hearing you say it's speculation to see why, when you look at the full context, it would be, you know, an unreasonable conclusion to think it's more likely than not that he was using them in the way that, frankly, it's somewhat intuitive that that's why you would have that kind of weaponry, that kind of ammunition. Again, I can't point to anything other than... Just one last question.  A lot of the district court's analysis is focused on the dangers of machine guns. Yes. You mentioned that much of this ammunition is not ammunition for a machine gun. Is that right or is that wrong? What's right is that the Glock chip corresponds to certain weaponry with certain caliber and the bullets are a completely different caliber. And so does that make them of a caliber that makes... Does not match, so... Does not match being used in a machine gun? Or is that irrelevant? The chip and the bullets could not be used together in one firearm. Okay, so I... It's not that, but Chief Judge Barrett's trying to figure out if the bullets can be used in a machine gun. Yes, they can be used in a number of different... But they can also be used... In other words... But what makes the... I guess what I'm asking is... The district court arguably thought... Well, is it your contention that the district court was under the impression that there was no distinction between the ammunition with respect to whether it could be used in the machine gun that the Glock would have been or not? Because that arguably could be a problem given how much the district court was focused on the dangers of machine guns if it thought without really a basis that all of this is part of his use of machine guns. So that's part of the contention. The district court does not tell us and counsel repeatedly says, this is a chip, what makes this case a machine gun case is the chip itself, correct? And the rest of the bullets are not that. Well, the rest of the bullets could be used in a conventional pistol or they could be used in something else. And the problem is, even if there was an actual gun here, it can either go to the ammo or it can go to the chip. It cannot go to both. But what he says, he doesn't connect them. He just says, Nieves possessed 149 rounds of .223 caliber for an assault rifle. Is that a true statement by the judge? In the sense that they may be used with that, they may be used with a conventional pistol, but the chip and the ammo cannot be used. But the judge doesn't really actually draw that. Which is part of the problem, that when we're talking about these kinds of cases, we look at this court's case law that tells us, well, yes, you have a physical gun with ammo that can be used in that physical gun and that increases the harm to society. We have a complete disconnect here. One last question from me before. You make a point, oh, the criminal record, the crime is old and therefore the judge overstated the criminal record. Between the commission of the first crime and this crime and the supervised release, over that time, how much, for what period of the time was the defendant incarcerated as opposed to being? It was mostly an incarceration period. There were five months between release and this offense. So that whole period of 2012? It was mainly incarcerated. Part of our concern with what Your Honor is raising is really the conflation of the supervised release violations, which were mainly technical, failing to report a drug positive. But to the extent you suggest, oh, that crime was a long time ago, if I accept what you say about the supervised release are not major events, which I appreciate, still to say that he was in the community for a long period of time doing well, that would be inaccurate. To say that he was in the community would be inaccurate. Okay. Thank you. Thank you. Thank you, Counselor. We'll turn it over to Apoli. Please come up and introduce yourself on the record. Good morning, Your Honors. May it please the Court. Maria Luchter for the government. The Court should affirm Mr. Nieves' sentence as both procedurally and substantively reasonable because the district court here thoroughly explained which reasons and why warranted the upward devariance sentence that was 18 months lower than the initial sentence. Indeed, as laid out in pages 31 and 35 of the addendum, the district court in case-specific terms explained why it imposed a 66-month sentence, and the reasons it provided have been approved by this Court in upholding upward devariance sentences. Now, I can start with the amount of ammunition, which is what this Court focused on with my brother, Counsel, in questioning. And it was reasonable for the district court to rely in part on the amount of ammunition in this case because upon remand, upon recalculating the guidelines, Mr. Nieves' guideline range would have been the same, whether or not he possessed the ammunition or the drugs in that case because the guns were grouped here, and that count two, the possession of machine gun, was used as the highest offense level, was used in calculating the guidelines. So in other words, Mr. Nieves' ammunition and the amount of drugs he's possessed, they did not change the guideline calculation in that sense. So it was reasonable for the district court to rely on that, to rely on the amount of ammunition here to determine that an upward devariance sentence was warranted. Indeed, as the government noted at the sentencing hearing and in its brief, even if Mr. Nieves had possessed four or five rounds of ammunition, he would still be convicted under that count one. And here, he possessed 149 rounds. And that was not all the district court considered, and that's very important to point out. The district court considered Mr. Nieves' history and characteristics. It considered the similarities between the initial offense and the current offense. It considered the two prior supervised release violations, and that Mr. Nieves had committed the most recent offense mere months after being released from his most recent incarceration. And not only that, the district court also considered the circumstances of the offense. It considered that Mr. Nieves not only possessed drugs for sale, but he was also observed selling drugs, engaging in drug transactions. And then the district court relied on the amount of ammunition as well as the community characteristics. So it was reasonable. So they say that the problem is that that was worth a certain number of months, all of this was worth a certain number of months at the first sentencing hearing, and now all of a sudden at the second sentencing hearing, it's worth more months above the guideline range. And they say that's problematic. What do you say to that? It is not problematic, Your Honor. And I have three points to make in response to your question. First, as I explained beforehand, the guidelines upon remand were different. So the district court started with the new guideline range, and it was reasonable for the district court to reevaluate the sentencing factors here based on what the guidelines now were. And second, Mr. Nieves attempts to make the type of mathematical formulation out of the district court's discretionary weighing of the sentencing factors. But as the Supreme Court in Gall stated, it rejected that type of rigid mathematical formula in determining whether the district court's explanation was sufficient. And third, it is a discretionary determination. The question here is, did the district court abuse its discretion when it determined that the 66-month sentence was the most appropriate sentence in this case based on the sentencing factors? And it was not. When the enhancement applied, what was the sentence? The sentence with the enhancement that the district court provided was 84 months. And here now, upon remand, it's 66 months. So it's 18 months lower than the initial sentence. And under the enhancement, do you recall what the enhancement did to the range? It was a four-point enhancement. I don't know off the top of my head. I know it's in our briefing. I think it was 50-something, and it was a 13-month variance from that. So the four-point enhancement raised the guideline range. And so, roughly speaking, isn't it, I guess my thought is, isn't, I mean, I know we're not supposed to do math, but there's a way in which you could understand the district court did math, which is not a problem for it if it does math. But essentially, if the value of the enhancement under the guidelines is roughly 18-20 months, then he gave the same sentence minus the enhancement. Is that a fair way to look at what he did? I guess it could be. The government's point is that he looked at the sentencing factors. Maybe that turned out to be what happened. Not that he did that, but that would add to the reasonableness of what the district court did, I suppose, right? Because if the only objection before was the enhancement was wrongly applied. Perhaps that's one way of looking at it. The district court did not make any indication on the record here that that's what it did. In pages 31 to 35, it made a very explicit analysis of why it thought the 66-month sentence was appropriate. Is it also the case that the 66 months was the high end of what, was that the government's original recommendation? That was the government's initial recommendation as well. The government, in its sentencing memorandum, in the initial case already explained that even if the district court or this court were to disagree with the guideline recommendation that the government provided at that time, which included the four-level enhancement, the government's position was always the same. The government's position at that time was that the 66 months was appropriate even if the enhancement should not have applied. That's correct, Your Honor. Yes. If Your Honors have no further questions, I will go ahead and rest on the brief, and I would ask that this court affirm. Thank you. Thank you, Counsel. Counselor, attorney for appellant, please come up. You have a two-minute rebuttal. A couple of points on the mathematical or the original sentencing and the subsequent sentencing. Number one, we think it's a relevant data point in the sense that the first time around- Relevant? Relevant. Irrelevant. Is relevant. Relevant data point in the sense that it gives us a sense of what the district court was thinking the first time around. It thought this kind of justification justifies 13 months, and now pretty much the same is justifying 25 months. There's a 12-month gap that's really unaccounted for, at least- I guess is that the right-I mean, I know that's how you frame it, but I guess I'm wondering whether the more sensible framing is take the sentence he gave the first time, which matched a bump up from the 66-month the government recommended independent of the enhancement. He then gave it finding the enhancement. The enhancement's worth about 18 months, right? So that gets you to 84. 18 to 20. Then the second time around, he says, okay, no enhancement. We'll go back to 66. I mean, from that perspective, it's not-there's no missing 12 months that's unaccounted for. But that's- I understand you're doing it relevant to the range, but he was initially not working on the range to begin with. Right. But what the Supreme Court and this court has said, and Flores-Gonzalez concurrence, that the process is we look at the guideline sentencing range, we identify what is the Heartland case, and then we- He has to justify a variance relative to this range. I'm not disputing that. He has to do it relative to the new range, and it's a bigger delta. What I'm trying to explain is that-and the government sort of hints at it when they say, well, this is the initial sentence, and this is lower than the initial sentence. Well, that's not the right pegging. But is it-I mean, I guess where I-I followed your brief, but I wasn't sure I agreed with it in the following way. You said, okay, one was 13 months, one was 25 months. Those are different, but the facts are the same. But couldn't the district judge have said the first time around, wow, he gets a four-level enhancement for this use thing. That's a lot. So that cabins sort of where I'm going to go with the variance, because we're already up here, and that four-level thing seems kind of harsh on these facts, but that's how the book works. Now, okay, this court says, no, that was wrong. That's not how the book works. We're down here, and he says, okay, all the rest is the same. I feel like 66 months is right. I'm giving him some benefit for the book issue, but it's still these constellation of facts. So is this matching of months really the right frame to think about this? Like I said, I think it's a relevant data point. I don't know that it is a mathematical formula, and I think it's relevant because it tells us this is not what Gall and Rita tell us has to be done. And on top of what we've already discussed, here the government, it does give the same 66-month recommendation, but they do that because they tell the district court, look at Kimbrough. You can do some sort of policy-type analysis. You can look at Owlette and tell us that the guidelines are not accounting for this, that you're untethering, and the district court explicitly says on the record, no, I'm not doing that. I'm doing what Gall and Rita say I'm doing, but this record points to the opposite. But the record is consistent with the court doing what Rita says, finding the correct guideline range and going from there. It's consistent with that. It is not consistent with saying what is the mine run machine gun possession case? What does that universe look like? And these are the arguments that counsel below is trying to make. How do you respond to Judge Aframe? Judge Aframe talked about the constellation of differences between the mine run in this case, his prior criminal involvement with drugs and a gun, the excessive amount of bullets here. I mean, it's not the mine run case. Again, when we look at bullets, when we look at community factors, the fact that there is no gun here does not give either the case-specific connection to the community factor analysis, nor does it give the underlying rationale of the ammunition cases, which is when there is a gun that can be used with bullets, that increases harm to society. So when we take those two things out, all we're really left is, in part, some of the criminal history and the drug dealing, and we don't know really how the district court put these things together to get not to a mine run case but to a 25-month upward variance. One way to think about it is if this was the first sentence and he just gave 66 months on this record and he doesn't apply the enhancement, then we would just have this conversation. Is that a justifiable variance? It's definitely a significant variance. There's got to be a good explanation for it, and then we just apply our case law. The thing that's a little different here is he gave an earlier sentence. I taught the thrust of your brief pointing out the difference between the delta the first time and the delta the second time in terms of the variance was to suggest somehow he didn't really do what he needed to do to take account of the enhancement being gone. Yes. That's sort of the thrust of why that point's being made, and I guess maybe just one last chance to answer this. I could see being concerned if you have an 84-month sentence the first time, you go to the First Circuit and you say that's error because there was an enhancement applied. Then on remand, the judge says, okay, 82 months. That would be concerning, right, because it's lower, but you have a feeling like they're just now kind of putting the enhancement back in when there's no good rationale. But that's not this case because the reduction is consonant with the amount of time of the enhancement. That, to me, seems irrelevantly significant. Somewhat, but then again, the government is We still have the variance. Well, right. We have the variance, and we also have the fact that the government here is putting this sentencing package before the judge where it says you can get to 66 months looking at Kimbrough, looking at Ouellette. The court pretty much takes that hook, line, and sinker but says, nope, not Ouellette, not Kimbrough, and that also is problematic to us. Thank you, Your Honors. Thank you, Counsel. That concludes arguments in this case.